IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MC ACQUISITIONS, INC., d/b/a )
MILLCAST, INC., )
  )
      Plaintiff/Counterclaim )
      Defendant, )
  )
vs. )      Case No. 2:04-cv-0388-TMP
  )
ARCHITECTURAL PRODUCTS, INC., )
  )
      Defendant/Counterclaimant. )

MEMORANDUM OPINION

        This cause comes before the court on the motions for summary judgment filed by plaintiff MC Acquisitions, Inc., d/b/a Millcast, Inc., (hereinafter "MillCast"), on March 1, 2005. Document 41 is plaintiff's motion for summary judgment on a claim of open account allegedly owed to plaintiff by defendant Architectural Products, Inc., (hereinafter "API"); document 43 is plaintiff's motion for summary judgment with respect to API's counterclaim against plaintiff. Although it appears to be undisputed that API owes MillCast a sum of money on open account, API contends that it is entitled to setoff the yet-to-be-determined value of its counterclaim against the debt. The parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

Procedural Background

        Plaintiff MillCast filed its original complaint in this action on February 26, 2004, alleging five causes of action against API: (1) a claim for open account in the amount of $24,620.28, (2) fraud and misrepresentation, (3) unjust enrichment, (4) breach of contract, and (5) breach of warranty. The

final four claims alleged by MillCast all arose out of API's assertion that certain porch posts sold to API by MillCast were defective, and cracked due to the harshness of Michigan winters.  After the court denied API's motion to transfer venue of this action to the Eastern District of Michigan (where API is located), API filed its answer and counterclaim on May 28, 2004.  The counterclaim alleged five claims against MillCast: (1) breach of contract, (2) breach of express warranty, (3) breach of implied warranty of merchantability, (4) breach of implied warranty of fitness for a particular purpose, and (5) fraud and misrepresentation.

On June 23, 2004, MillCast filed an amended complaint further clarifying its claim for fraud and misrepresentation.[1]  It alleged that API represented to MillCast that the failure of the porch posts was the result of the posts' inability to withstand the freeze-thaw cycle of the Michigan winter, when, in fact, the failure was the result of improper installation by API.  MillCast alleged that, in reliance on API's allegedly false representation, it incurred additional costs for materials and installation of replacement posts.  On September 29, 2004, the court granted API's motion to dismiss the plaintiff's breach-of-warranty claim, but denied a motion to dismiss MillCast's fraud claim based upon the more particular allegations made in the amended complaint.

On January 7, 2005, API filed an amended answer to the plaintiff's complaint, this time asserting the affirmative defense of set-off.[2]  It also filed an amended counterclaim against MillCast,

---

[1]  The amended complaint was filed without first obtaining leave of court.  See FRCP 15(a).  The court granted leave *sua sponte* on July 1, 2004.  The court reads the pleading as an amendment to the original complaint, rather than an amended complaint that replaces or supplants the original complaint.

[2]  Plaintiff has moved the strike the amended answer and amendment to the counterclaim in part on the ground that API failed to obtain leave of court before filing them.  See Doc. 32.  That motion is DENIED, and leave to file is hereby GRANTED *sua sponte*.  Just as plaintiff MillCast filed its amended complaint without first obtaining leave of court, the court must overlook this

alleging that, to the extend a settlement agreement reached by the parties in September 2003 was not voided by MillCast's alleged fraud in the inducement of the agreement, MillCast has breached the settlement agreement by again supplying defective and non-conforming porch posts as replacements for the original posts.

After several discovery disputes, which are the subject of another order, MillCast filed the instant motions for summary judgment. At the same time, it voluntarily dismissed its claim for fraud and misrepresentation against API, leaving pending its claims for open account, unjust enrichment, and breach of contract. The motions for summary judgment have been fully briefed, and the court concludes that oral argument is not necessary.

<u>Summary Judgment Standards</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Celotex</u>, 477 U.S. at 322-

---

failure by API. Good for the goose, good for the gander.

3

23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than

4

show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations

omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must

be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S.

at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless,

credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all

justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City

of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

Facts for Summary Judgment Purposes

Applying the standards reviewed above, the following facts appear to be undisputed by the

parties, or, if disputed, are taken in a light most favorable to API, the non-moving party.

Defendant/Counter claimant Architectural Products, Inc, is a Michigan dealership of

architectural components such as crown molding, columns, and porch posts.[3]  During 2002, API was

involved in a building project in Canton, Michigan, called the Turnbury Project, which was a mixed-

use residential project consisting of condominiums and multi-family residences.  Although the

original architectural specifications called for porch posts manufactured by a company called Fypon,

---

[3]  As have the parties, the court uses the terms "porch post," "post," and "column"
interchangeably for purposes of this opinion.

the general contractor for the Turnbury Project instructed API to locate less expensive posts because the project was running over budget. API was familiar with MillCast, having bought columns from plaintiff in the past. API discussed with MillCast using a post with a wooden core coated on the exterior with a composite of fiberglass, gypsum, and resin. Prototype posts were shipped to API by MillCast, but because these prototypes experienced problems with chipping, scuffing, and marring during shipment, API requested further improvements, and MillCast continued to make revisions to the product. Ultimately an agreement was reached during 2002 for API to order 448 columns from MillCast.

Over a period of several months in 2002, MillCast shipped the columns to API in Michigan, where they were installed at the Turnbury Project by employees of the general contractor, Cedar Creek Carpentry. MillCast supplied installation instructions with the columns, which were sold subject to a written limited warranty. The warranty states:

> MillCast Inc. warrants that for the "Lifetime" of ownership the column is free from defects in material and workmanship. "Lifetime" means as long as the original purchaser owns the structure to which the column is attached upon proper installation of the product. MillCast Inc. will repair or replace, at its option, any column that has failed as a result of defective material or workmanship. At no time will MillCast Inc. be liable for more than the original purchase price of the column. MillCast Inc. does not warrant against the cost of replacement or damages resulting from replacement of the defective column. It shall remain the responsibility of the customer to insure [sic] the columns purchased are designed for their [sic] particular installation. Any deviation from the standard installation as shown in the instructions (included with each column) voids all warranties.

During the winter of 2002-2003, the columns installed at the Turnbury Project began to crack vertically and horizontally. In early 2003, API complained to MillCast about the cracking, claiming that the columns could not stand-up to the freeze-thaw cycle of Michigan winters. In response, Britt

6

Russell of MillCast sent the following email to the president of API, Ron Crossley, on February 11, 2003:

> Hello Ron,
>
> We great appreciate your patience and are having our engineering testing firm perform certain tests involving sub zero temperatures with the post loaded at 1000 lbs.  We are doing this to try and determine what alterations need to be made to correct the existing problem.  One of the options we have is to offer our 6" round and or [sic] square column at the same price in place of the porch post but we are determined to diagnose and correct the porch post problem.  We will inform you as to measures we take once we have the test information we need to go forward.  We thank you again for the patience you have had throughout this situation and will contact you soon with some answeres [sic].
>
> Britt Russell

MillCast was later informed by its engineering firm that the firm lacked the equipment to perform the testing requested by MillCast.  No independent testing of the columns was performed, although MillCast itself placed a section of a wet porch post in a freezer for two days, and it did not crack.  API was never informed that no testing was performed by an independent firm as indicated by the email.[4]

In April 2003, MillCast sent David Upton to the Turnbury site to examine the columns.  He confirmed that many of the columns were cracked and that a problem existed.  He took photographs of the cracked posts and returned to Alabama to determine what could be done to solve the problem.  API was considered a valuable customer of MillCast, and MillCast was willing to work with API to resolve the problem.  MillCast concluded that the cracking might have been caused by the wooden

---

[4]  MillCast disputes this, claiming that Russell told Crossley that the engineering firm had not been able to perform the testing.

core of the posts wicking moisture which froze during the winter, causing the core to expand. It was decided that the core of the posts would be changed to metal to prevent wicking.

Negotiations began between MillCast and API, during which Russell told Crossley that testing of the columns had been performed, although he did not describe the testing,[5] and that the changes made to the replacement columns would make them able to withstand the Michigan winter.[6] On September 19, 2003, the parties reached an agreement, calling for MillCast to ship 448 metal-core replacement posts to API at no charge, credit API $4,480 as reimbursement for installation costs, credit Cedar Creek Carpentry $8,960 as reimbursement for its installation costs, and credit API with $3705.59 for other job site expenses. In return, API agreed to pay up to date its account with MillCast in the amount of $37,361.06. The written "settlement" document says nothing about the limited warranty or whether the settlement released or was intended to release any claims either party held against the other at that point in time. During the negotiations leading to the agreement, however, Russell informed Crossley that MillCast would extend its warranty on the replacement columns for one year.

During the remainder of September and October 2003, MillCast shipped the replacement posts as provided by the agreement, most of which were installed at the Turnbury Project site. With the onset of winter, however, the replacement posts also cracked. Once again David Upton was dispatched to the site in December 2003 to examine and repair the replacement posts. To see if the repairs would work, Upton forced bondo-like material in the cracks of several columns and sanded

---

[5] MillCast disputes this. Russell testified that he fully explained to Crossley the testing he performed.

[6] Russell also testified that he told Crossley that the changes MillCast had made in the columns (primarily changing to a metal core) would solve the problem.

them smooth.  He left the posts unpainted to determine if the repairs would work, but they cracked also.  Cracks occurred both in installed posts as well as several uninstalled posts that were left on the work site not under load.  Crossley performed a test similar to that performed by MillCast, putting a section of a post in a freezer where it cracked also.

At the time suit was filed on February 26, 2004, API owed MillCast $24,620.28 on its account with MillCast.  This debt was entirely unrelated to the porch posts disputed in this action, but was owned for other architectural columns with which API had no problems.

Summary Judgment as to Counterclaims

Plaintiff/Counterclaim Defendant MillCast argues that it is entitled to judgment as a matter of law on all of the claims asserted against it in API's counterclaim.  First, it contends that the settlement agreement reached between the parties on September 19, 2003, resolved all disputes then existing, including any claims of fraud, breach of contract, and express and implied warranty claims. In response API contends that the "settlement agreement" was not intended or understood to be a full and final settlement between the parties, but only an agreement by which MillCast would carry out its warranty obligations on the posts.  Crossley has testified explicitly that he did not understand or intend the agreement to surrender API's claims against MillCast arising from the cracked posts.

At the outset, the court notes that the document reflecting the agreement of the parties was drafted by MillCast; therefore, any ambiguity in the language or intent of the document is construed against it as the drafter.  SouthTrust Bank v. Copeland One, L.L.C., 886 So. 2d 38, 43 (Ala. 2003)("It is a well-established rule of contract construction that any ambiguity in a contract must be construed against the drafter of the contract); see also Ex parte Palm Harbor Homes, Inc., 798 So.2d 656, 661 (Ala. 2001); Birmingham News Co. v. Lynch, 797 So. 2d 440, 443 (Ala. 2001); Brewbaker Motors,

9

Inc. v. Belser, 776 So. 2d 110, 112 (Ala. 2000); Strickland v. General Motors Acceptance Corp., 578 So. 2d 1275, 1277 (Ala. 1991); Lilley v. Gonzales, 417 So. 2d 161, 163 (Ala. 1982); Alabama-Tennessee Natural Gas Co. v. City of Huntsville, 275 Ala. 184, 153 So. 2d 619, 628 (1963). There can be little question that this agreement is ambiguous in a number of respects, including whether and to what extent the parties actually intended to fully resolve the warranty, fraud, and contract issues outstanding between them due to the problems experienced with the original porch posts. Was the agreement intended to be a full accord and satisfaction of the claims between them, or merely an interim agreement as to how MillCast would meet its warranty obligations? Did the parties intend to extend the limited warranty to the replacement posts? Such ambiguities open the door for parole evidence of the parties' intent, and their evidence clearly shows genuine issues of material fact about those intentions. Plaintiff is not entitled to summary judgment where the facts underlying the intentions of the parties are in dispute.

Even if the September 2003 agreement of the parties constituted an unambiguous settlement of the warranty dispute between them, there are genuine questions of material fact concerning API's assertion that the agreement was obtained by misrepresentation. Crossley, the president of API, testified that he was led to believe that MillCast was obtaining independent testing of the posts to attempt to determine the cause of the cracking. In fact, no independent testing was performed, yet API was never advised that the independent testing mentioned in Britt Russell's email never occurred. MillCast's subsequent representation that it had "fixed" the problem, coupled with API's mistaken belief that independent testing had been performed, misrepresented to API that a problem had been identified and corrected, and that no further problems with cracking would occur. There are sufficient facts in dispute concerning these communications that the court cannot say as a matter

10

of law that the September 2003 agreement was not induced by, at least, an innocent misrepresentation by MillCast.

Further, API has amended its counterclaim to assert a breach of the September 2003 agreement, contending that MillCast supplied replacement posts that were also defective and non-conforming. In light of the problems experienced with the original posts, and further in light of MillCast's representation that it has fixed the problem, it cannot be doubted that the parties intended the replacement posts to be of such a quality as not to crack the way the original posts had. Because the replacement posts were an essential part of the consideration bargained for by API, the failure of the replacement posts also constituted a failure of consideration for or a breach of the agreement.

Likewise, all claims asserted by API in the original counterclaim survive summary judgment. First, the court reads API's "breach-of-contract" claim to assert a claim under the Alabama Uniform Commercial Code for delivery of non-conforming goods. The contract for the sale of the posts by MillCast was a contract for the sale of goods within the meaning of Article 2 of the UCC. See Alabama Code § 7-2-102 (applicability of Article 2 of UCC to contracts for the sale of goods). The non-conforming quality of the posts was not discovered (and could not have been discovered, even with reasonable inspection) until after the posts were delivered, accepted, and installed, and winter weather caused them to crack. At that point, API had available to it the remedies provided by the Alabama UCC. For this reason, API's claim for "breach of contract" is not based upon common-law rights and remedies, but those under the UCC.

API's first UCC theory is based on breach of express warranty. Although MillCast warranted the posts for the "lifetime" of ownership by the original owner of the structure to which the posts were attached, it also limited its liability to repair and replacement of the non-conforming posts.

11

And, even though MillCast performed under its limited warranty, replacing the original posts with new ones, the circumstances "caused] ... [the] limited remedy to fail of its essential purpose...." Alabama Code § 7-2-719(2).  API has offered evidence that the replacement posts also cracked during the winter of 2003, thus causing MillCast's limited remedy of repairing or replacing the original posts to fail of its essential purpose, that is, of supplying posts to API that conformed to the contract.  This essential failure left available to API those remedies provided by the UCC, including suit for incidental and consequential damages.

Whether the ability of the posts to withstand the freeze-thaw cycle in Michigan[7] was an element of the original sale contract is subject to genuine issues of fact.  API points out that the parties had specifically negotiated and discussed whether the posts were appropriate for use in Michigan; thus, the ability of the posts to withstand the climate in Michigan was an essential part of the consideration of the contract to buy the posts.  MillCast, on the other hand, points to the language in its limited warranty that "It shall remain the responsibility of the customer to insure [sic] the columns purchased are designed for their [sic] particular installation," and contends that API made its own decisions about the suitability of the columns.  This fact dispute precludes summary judgment on the "breach-of-contract" claim, as well as the express and implied warranty claims, in the counterclaim.[8]

_____

[7]  The court is not unmindful that MillCast disputes that the freeze-thaw cycle caused the cracks, but for summary judgment purposes, the court must accept API's evidence and theories.

[8]  Again there are fact disputes about the negotiations, agreements, and intentions of the parties affecting these claims.  Under the implied warranty-of-merchantability claim, a dispute exists as to whether columns of this sort are expected to last some period of time without cracking.  In order to be "merchantable," they must be "fit for the ordinary purposes for which such goods are used."  Ala. Code § 7-2-314(2)(c).  Plainly, a fact dispute exists whether these posts met that definition in that they cracked during the first winter they were installed.

Furthermore, API's implied warranty claims survive the argument that MillCast effectively excluded them by the terms of its limited warranty. To effectively exclude the implied warranties, Alabama Code § 7-2-316(2) requires:

> Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

First, none of the circumstances described in subsection (3) of § 7-2-316 applies. Looking to the language of MillCast's limited warranty, it is apparent that it does not mention merchantability and is in no way "conspicuous." The disclaimer specified in the statute does not appear in MillCast's warranty language. There simply is nothing about the limited warranty provision that effectively excludes reliance on either implied warranty. Indeed, it is not entirely clear that the express warranty, as written, even was intended to exclude implied warranties, except for the last sentence which speaks of voiding "all warranties" if deviations from the standard installation instructions occur. The reference to "warranties" seems to imply a recognition that the express warranty is supplemented by the statutory implied warranties.

MillCast's arguments concerning API's claims on the implied warranties does nothing more than emphasize the fact disputes underlying them. Whether posts that crack in winter weather are considered "fit" and merchantable within the trade is a fact issue. Likewise, whether API relied upon MillCast's expertise in determining whether these columns were suitable for use in Michigan is a fact dispute that precludes summary judgment as to API's claim for breach of the implied warranty of fitness for a particular purpose.

13

The court is persuaded that API's fraud claim also survives summary judgment.  The only allegedly false statement or representation made by MillCast identified in the summary judgment brief relates to MillCasts representation that it was having its "engineering firm" test the columns to determine the cause of the cracking experienced in the original posts.  Plainly, this means that API can point to no false statement or representation made with respect to the original posts on which it relied.  If a fraud occurred, it occurred during the negotiations by the parties trying to resolve the dispute that existed due to the failure of the first posts.  API contends that MillCast led it to believe that independent engineering testing had been performed and that, as a result, a solution to the problem had been found.  API further denies that MillCast ever advised it that, in fact, the expected engineering testing did not take place.  Thus, API asserts that it entered into the agreement on September 19, 2003, to resolve the warranty problem on the original posts with the mistaken belief, based on the statements made by MillCast, that independent engineering tests had led to a "fix" of the cracking problem, when, in fact, that was not true.  Only with that incorrect understanding was API willing to accept replacement posts, which it believed were now "fixed," to resolve its warranty claim on the original posts.  Certainly there are disputed issues of fact whether MillCast advised API that the testing did not take place, or whether the independent nature of the testing was material to API's acceptance of the proposed replacement agreement.  These factual issues preclude the court from finding as a matter of law that API was not induced to reach the September 2003 agreement based in part on a misrepresentation created by MillCast.

In sum, the court finds that MillCast's motion for summary judgment, seeking summary dismissal of API's counterclaim is due to be denied.

<u>Summary Judgment on Claim for Open Account</u>

In a separate motion for summary judgment, MillCast asserts that it is entitled to judgment on the undisputed facts that API owes it $24,620.28, plus interest, for goods sold to API on open account.  API admits that it owes the sum for goods it purchased that were entirely unrelated to the porch posts disputed in this action.  It contends, however, that it is entitled to set off against that debt any recovery to which it may be entitled on its counterclaim.

On the defense of set-off, the Alabama Supreme Court has written the following:

> The right of set-off (i.e., the right of a defendant to assert a counterdemand against the plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action) is a fundamental right of any creditor.  It is based on principles of right, justice, and benevolence.  The right of set-off, which is essentially a doctrine of equity, is based on the principle that natural justice and equity require that the demands of parties mutually indebted be set off against each other and that, in a judicial proceeding by one against the other, only the balance should be recovered.  20 AM.JUR. 2D Counterclaim, Recoupment, and Set-off §§ 2, 7 (1965).

<u>Head v. Southern Development Co.</u>, 614 So. 2d 1044, 1046-1047 (Ala. 1993).  It is not necessary that the debts being set off are related in any manner other than that the same parties occupy a debtor-creditor relationship.  The debt claimed by the defendant and to be used for a set-off can be "extrinsic" to the debt claimed by the plaintiff.  Such is the situation here; defendant API admits that it owes MillCast $24,620.28 on open account, but also asserts that MillCast owes it a yet-to-be-determined amount on its claims for breach of warranties and fraud.  In the event API succeeds in getting an award against MillCast, the admitted debt on open account can be set off against it.  Thus, whether and to what extent MillCast gets a judgment against API depends on whether API prevails on any of its claims and in what amount.  Judgment for MillCast on this claim must await the

outcome of trial on API's claims.  Because the open account debt is undisputed, summary judgment will be granted, subject to be being off set by any recovery obtained by API at trial.[9]

Conclusion

By separate order, MillCast's motion for summary judgment on open account will be granted, but its motion for summary judgment on API's counterclaim will be denied.

DONE this 28th day of April, 2005.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

---

[9] The court will calculate the set-off, if any, after a jury verdict on API's claims.